# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TERYLL SOMERVILLE, Individually and
as Personal Representative of the Estate of
EDGAR SOMERVILLE, SR., deceased,**

        **Plaintiff,**

**-vs-**                                                  **Case No. 6:08-cv-787-Orl-22KRS**

**UNITED STATES OF AMERICA,**

        **Defendant.**

_____

## MEMORANDUM OPINION AND ORDER

This is a wrongful death action arising under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. Plaintiff Teryll Somerville seeks damages from the United States of America for the alleged wrongful death of her husband, Edgar Somerville. Prior to Somerville's death, he was treated at the Department of Veteran Affairs, Daytona Beach Outpatient Clinic ("VA"). Plaintiff claims that two physicians at the VA – Somerville's primary care physician Jennifer Coady, M.D. and radiologist James Patterson, M.D. – missed several opportunities to diagnose Somerville for transitional cell carcinoma ("TCC").[1] According to Plaintiff, this was a deviation in the standard of care that caused Somerville's death. After a four-day bench trial held on May 24-27, 2010, the Court now renders its decision on the merits.

---

[1] The United States concedes that Dr. Patterson's failure to find the left renal lesion on the August 31, 2005, Computerized Tomography ("CT") scan breached the standard of care.

The Court finds that Dr. Coady did not deviate from the standard of care in her assessments and scheduling of tests for Somerville. Further, the Court concludes that Plaintiff failed to prove it was more likely than not that Dr. Patterson's breach proximately caused Somerville's death. Thus, the Court finds in favor of the Defendant, United States of America.

## I. BACKGROUND[2]

Somerville suffered from a long history of physical and psychological problems that included coronary artery disease, hypothyroidism, bipolar affective disorder, type II diabetes mellitus, and PTSD. (Joint Ex. 1 p. 750.) These problems continued during the relevant time period – November 2004 to August 2006. At the time Dr. Coady first examined Somerville on November 23, 2004, he was 61 years old and had smoked a pack of cigarettes daily for over 40 years. He complained of brown urine occurring for five days with pain that morning.[3] (*Id.*) Dr. Coady noted that Somerville presented with gross hematuria two years previously and was successfully treated for a bladder infection.[4] (*Id.*) Dr. Coady treated for a possible urinary tract infection ("UTI") but also ordered an Intravenous Pyelogram ("IVP")[5] and renal ultrasound to check for a possible kidney or bladder lesion. (*Id.* at 752-53.) These tests, performed December 7, 2004, showed an enlarged prostate but were otherwise negative. (*Id.* at 746.) Dr.

---

[2] The following undisputed facts derive from the parties' joint final pretrial statement and the medical records as received at trial.

[3] Painful urination – dysuria – often indicates infection.

[4] Hematuria is blood in the urine. When visible, it is gross hematuria.

[5] An IVP is a x-ray examination of the kidneys, ureters, and bladder that uses iodine contrast material. The material collects in the kidneys and ureters, which the radiologist can then assess.

Coady instructed Somerville to attend a previously scheduled appointment with a different physician at the VA but to return earlier if the symptoms continued. (*Id.* at 753.)

Somerville did not contact Dr. Coady regarding any continuing symptoms and did not see her again until June 28, 2005. Dr. Coady noted that Somerville complained of headaches and had occasional dark urine at that time as well. (*Id.* at 676, 678.) She also noted that he had hematuria twice in the past three years and that she had prescribed antibiotics. However, Somerville never followed up. (*Id.* at 678.) Dr. Coady ordered a renal ultrasound to diagnose the cause of the hematuria and noted that she would contact urology if it persisted after antibiotics. (*Id.* at 680.) The renal ultrasound occurred on July 25, 2005, at the VA Clinic. (Doc. No. 27 p. 3.) Dr. Patterson was the radiologist who interpreted the ultrasound. He did not identify any lesion on Somerville's left kidney. (*Id.*)

Dr. Coady saw Somerville again on August 1, 2005, when he presented with gross hematuria that had developed over the previous week. He did not have dysuria but was experiencing suprapubic and right flank pain and abnormal weight loss. (Joint Ex. 1 p. 668.) Dr. Coady noted Somerville's four episodes of hematuria in the previous year and that he had taken the entire course of antibiotics although it made him sick. (*Id.*) She also noted that his renal ultrasound was significant "only for possible minute calculi [kidney stones] on left." (*Id.* at 670.) Dr. Coady requested a CT scan of the abdomen and pelvis with and without contrast. (*Id.* at 672.) She scheduled a follow-up appointment for Somerville and instructed him to return sooner "for persistence/worsening of symptoms." (*Id.* at 671.) Dr. Coady also spoke with Somerville on August 4, 2005, to inform him of the scheduled CT scan and future cystoscopy. (*Id.* at 672.) She advised him to visit the ER if his symptoms worsened. (*Id.*) Dr. Coady noted

-3-

on August 25, 2005, that the CT scan was scheduled for August 31, 2005. (*Id.*) On September 2, 2005, she noted that the scan was completed and requested the scheduling of a cystoscopy with Dr. Matthew Merrell. (*Id.*)

When Somerville attended his follow-up visit on September 9, 2005, he again presented with gross hematuria. (*Id.* at 658.) Dr. Coady noted his previous problems concerning hematuria. (*Id.* at 660.) Dr. Coady also noted that urology had been consulted and that Somerville was to return for an appointment "one week after labs." (*Id.* at 661.) Dr. Coady saw Somerville next on October 5, 2005. At this visit, Somerville presented with microscopic hematuria in addition to his other chronic health problems. (*Id.* at 656.) Dr. Coady noted that he had no recent hematuria but had a cystoscopy scheduled later in the month and was to return for an appointment one week after labs. (*Id.*)

The urology consult with Dr. Merrell occurred on October 19, 2005. (*Id.* at 651.) Dr. Merrell noted that when Dr. Patterson interpreted the August 31, 2005, CT scan, he found a right perihilar cyst but no tumors, stones, or cystitis.[6] (*Id.* at 652.) Somerville attended another appointment with Dr. Merrell on November 16, 2005. (*Id.* at 645.) Dr. Merrell noted that Somerville's total abdominal pain had subsided. (*Id.*) He also noted "prostatic bleeding" and that Somerville did not "want to bother anyone with abdominal pain," declining referral to Dr. Coady. (*Id.* at 646.) Somerville was to follow-up with urology in six months. (*Id.*)

On January 16, 2006, Somerville presented at the Gainesville VA's emergency room with left flank pain that had grown progressively worse over the week. (*Id.* at 640.) His

---

[6] As previously noted, Defendant concedes that Dr. Patterson missed a 3 cm left renal lesion on this CT scan, thus deviating from the standard of care.

medical records contained a note that a previous scan showed renal calculi. (*Id.*) A CT scan taken that day revealed an upper left renal 5 cm lesion. Because of Somerville's long history of smoking, the VA was concerned he might have TCC or lymphoma. The VA performed exploratory surgeries on January 18th and 23rd that included renal washings, a ureteroscopic brush biopsy, and a bladder cytology.

After being diagnosed with a left renal pelvic tumor, surgery was scheduled for February 24, 2006. (*Id.* at 543.) On February 2, 2005, Somerville notified Dr. Coady of the intensity of his pain. Dr. Coady then contacted the surgeon to request an earlier surgery date, but the surgery schedule was full. (*Id.* at 538-29.) The surgery occurred on February 27, 2006, and the post-op diagnosis was TCC. (*Id.* at 485.) Pathology revealed it was invasive urothelial carcinoma, 8 cm, high-grade, forming a mass in superior pole, and that the adrenal gland was involved. (*See id.* at 443.) Somerville was ultimately unable to tolerate chemotherapy and died at home on August 7, 2006. (*Id.* at 377.)

## II. LEGAL STANDARD

In a negligence action under the Federal Tort Claims Act, the law of the place where the alleged act or omission occurred controls. 28 U.S.C. §§ 1346(b), 2674. The alleged negligence in this suit occurred at the VA Clinic in Daytona Beach, Florida; therefore, Florida law governs.

Florida's medical negligence provisions dictate that "the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider." Fla. Stat. § 766.102(1). Further, except in cases where a surgical instrument or supply has been left inside a patient's body after surgery, there is no presumption of negligence;

rather, "the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider." Fla. Stat. § 766.102(3). To establish proximate cause in Florida, a plaintiff must prove that the defendant's negligence more likely than not caused the plaintiff's injury. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

### III. ANALYSIS

The issues in this case are straightforward. First, the Court must determine the standard of care applicable in this case. Next, the Court must decide whether Dr. Coady breached the standard of care when she failed to diagnose Somerville's TCC after her initial appointment with him on November 23, 2004, and after subsequent visits on June 28, 2005, August 1, 2005, September 9, 2005, and October 5, 2005.[7] Finally, if a breach occurred, the Court must then decide whether Dr. Coady's breach – in addition to its analysis of Dr. Patterson's breach – proximately caused Somerville's death. Plaintiff bears the burden of establishing all three of these elements by a preponderance of the evidence. *Gooding*, 445 So. 2d at 1020.

To assist the Court in making the required determinations, each party presented the testimony of several expert witnesses at trial. Plaintiff's first expert was Dr. Mark Shoag, a Yale-educated medical doctor, who is board certified in internal medicine. He has reviewed cases for Plaintiff's law firm for the past 12 years – approximately 15-20 times a year for a few of those years but about 5 a year for the past year or two. Dr. Shoag testified that he did not review every page of Somerville's medical record; rather, he read what he considered relevant.

---

[7] Again, because the government concedes that Dr. Patterson breached the standard of care, the only question regarding Dr. Patterson is whether that breach caused Somerville's death.

Plaintiff next offered the expert testimony of Dr. Rolf Gobien, a diagnostic radiologist, who reviews about 12-20 cases a year for Plaintiff's firm. Plaintiff additionally offered the expert testimony of Dr. Barry Singer, who was educated at John Hopkins University and is board certified in internal medicine, oncology, and hematology. During his career, he has testified in court in over 700 cases. Dr. Singer reviewed Somerville's medical records from November 2004 through August 2006. Each of Plaintiff's expert witnesses admitted he did not prepare his own expert report; rather, Plaintiff's attorneys or staff wrote it for him. Plaintiff's final expert witness was Frederick Raffa, Ph.D., who testified about loss of support and services.

In rebuttal, the United States offered the testimony of Dr. Rosaline Vasquez, who is board certified in internal medicine. She is an adjunct clinical professor at Stanford University and also maintains a private practice focusing on patients with complicated issues. Dr. Vasquez testified that she read the entire 1300-1500 page medical record and reviewed it several times. The United States also offered the expert testimony of Dr. Peter Clark, a Harvard-educated urologist and an associate professor at Vanderbilt University. He testified that approximately 40% of his practice focuses on kidney cancer. The government's final expert was Dr. Erik Paulson, a full professor of radiology at Duke University and chief of abdominal imaging. Dr. Paulson has testified in court twice in the past four to six years. All of the government's expert witnesses testified that they prepared their own expert reports.

### A. The Standard of Care

The experts agreed that a urinalysis would be the appropriate first step to assess a patient presenting with gross hematuria. However, from that point their opinions diverged. Plaintiff's expert, Dr. Shoag, testified that the standard of care requires an immediate "work-up" for cancer

after an urinalysis comes back negative for UTI. According to Dr. Shoag, if the physician is not 100% sure that the hematuria was caused by UTI, even if the urine has already cleared up, the standard of care requires an ultrasound and IVP. If those tests fail to establish a definitive diagnosis, Dr. Shoag stated that the physician should refer the patient to urology or order a CT scan within one month. If the physician did not do so at that time (in this case November/December 2004), and the patient presented with gross hematuria several months later (such as June 2005), the physician would again deviate from the standard of care by failing to order a STAT[8] CT scan and urology referral. A physician would also breach the standard of care, according to Dr. Shoag, by not following-up after a renal ultrasound indicated no abnormalities. If the patient presented with hematuria a third time (such as in August 2005), Dr. Shoag testified that the standard of care requires a STAT (urgent) urology referral.

In contrast, Defendant's expert Dr. Vasquez stated that when a patient with a previous history of hematuria resolved by antibiotics presents with gross hematuria and has a negative urinalysis for UTI, a renal ultrasound alone would be a sufficient next step. She agreed that a follow-up appointment should be scheduled. She further testified that the literature does not support the contention that a CT scan is better than the combination of the IVP and renal ultrasound. Nor does it support, according to Dr. Vasquez, the contention that the standard of care requires a CT scan rather than another urinalysis followed by an ultrasound and a referral to urology for such a patient returning (e.g., in June 2005) with gross hematuria. Dr. Vasquez

---

[8] On cross examination, Dr. Shoag stated that he mis-spoke when he used the word "STAT" and should have used "urgent."

-8-

testified that if such a patient presents a third time with hematuria, a renal ultrasound and urology consultation are appropriate.

The Court establishes that a physician meets the standard of care for a patient presenting with gross hematuria if she initially performs a urinalysis, prescribes antibiotics to address possible UTI, and schedules a follow-up appointment. If symptoms persist though the urinalysis rules out UTI or despite antibiotics, the standard of care requires further follow-up. On this the parties agree.

The parties disagree regarding what that follow-up should entail. The Court finds Dr. Vasquez's testimony regarding the standard of care more persuasive based on her consideration of the individual patient, her experience working with difficult cases, her review and knowledge of the record, and her repeated references to the relevant literature. Thus, the Court determines that a primary care physician satisfies the standard of care at this step if she orders additional tests that include a renal ultrasound and/or an IVP. The Court finds that the standard of care does not require a CT scan if the problem remains undiagnosed at this stage. However, if the symptoms persist, the standard of care requires a urology referral.

**B.     Breach**

Having defined the standard of care applicable in this case, the Court now proceeds to consider whether Dr. Coady fell below that standard. The Court again finds that Dr. Vasquez's testimony was more persuasive than Dr. Shoag's regarding whether Dr. Coady deviated from the standard of care. Not only did Dr. Vasquez read the entire record and review it several times, it was very apparent that she knew the record in great detail. In contrast, Dr. Shoag only reviewed Somerville's recent medical history and seemed uncertain of several relevant details.

Dr. Vasquez's experience both as an adjunct clinical professor at a prestigious university and as a practitioner focusing on patients with unresolved cases again lends credibility to her testimony that Dr. Coady's history, assessment, and plan of care for Somerville were well within the standard of care. Therefore, the Court finds that Dr. Coady did not deviate from the standard of care.[9]

The evidence at trial showed that Dr. Coady saw Somerville in her office the day after he called complaining of gross hematuria. She prescribed antibiotics for a possible UTI and ordered a urinalysis, noting that he had previous episodes of hematuria resolved by antibiotics. Dr. Vasquez testified that Dr. Coady went beyond the standard of care by treating Somerville as a high-risk patient and ordering an IVP and a renal ultrasound. Dr. Coady also instructed Somerville to call or return if his symptoms persisted and to attend his previously scheduled follow-up appointment. Thus, she did not breach the standard of care at this stage.

Dr. Coady's next steps were also within the standard of care. Somerville neither contacted her nor returned to the VA regarding any persistent or increasing symptoms, and the scans revealed no abnormalities in the bladder or kidney, instead indicating "prostatic enlargement" consistent with hematuria. Thus, the standard of care did not require Dr. Coady to follow-up with additional tests. Dr. Coady was also within the standard of care when she saw Somerville next on June 28, 2005. Because he again complained of hematuria, she again

---

[9] The Court disagrees with Plaintiff's contention that Dr. Coady deviated from the standard of care by not following "best practices" guidelines. The standard of care is not equivalent to "best practices." The Court notes that it also disagrees with what it interprets as Defendant's implication that "quality of care" is synonymous with standard of care. Although it appears that the quality of care Somerville received from the VA was high based on frequency and variety, he is not precluded from alleging a breach of the standard of care.

prescribed antibiotics to rule out UTI, a common cause of hematuria, and noted a plan to follow-up in three to four weeks with a urology consult if it did not resolve. At his follow-up on August 1, 2005, he still complained of hematuria, and Dr. Coady satisfied the standard of care by consulting urology, who told her to order a CT scan of the abdomen and pelvis. She ordered the CT scan[10] and a cystoscopy.[11]

Finally, Dr. Coady did not deviate from the standard of care after she received the results of the misread CT scan. Both parties' experts agreed that Dr. Coady, as the primary care physician, could only craft her plan based on the radiologist's interpretation of the various tests. Though Dr. Patterson missed Somerville's abnormal left kidney and breached the standard of care when he read the August 2005 CT scan as negative for cancer or suspicious lesions, this does not affect whether Dr. Coady satisfied the standard of care. Neither side contends that the standard of care required Dr. Coady to order a second read of the CT scan or a new scan.

Subsequent to the CT scan, on September 9, 2005, Somerville complained again of gross hematuria among a host of other ailments. The Court finds Dr. Vasquez's testimony credible that Dr. Coady met the standard of care for this visit by completing a thorough history and examination and creating an appropriate plan. During the visit on October 5, 2005, Somerville reported no hematuria. Dr. Coady also had no reason to run further tests after his urology consult on October 19, 2005, because Dr. Merrell diagnosed probable prostatic bleeding and

---

[10] The Court disagrees with Plaintiff's contention that the CT scan should have been administered immediately in order to satisfy the standard of care. Until that point, the tests had not provided Dr. Coady any indication of a kidney or bladder abnormality – only prostatic enlargement.

[11] The cystoscopy was negative for bladder cancer.

Somerville did not want to be referred to Dr. Coady although he had experienced abdominal pain. Thus, the Court finds that Dr. Coady did not breach the standard of care.

**C.     Proximate Cause**

The Court's analysis does not end there, however. Because Dr. Patterson's failure to identify the left renal lesion on the August 2005 CT scan deviated from the standard of care, the Court now considers whether this breach was the proximate cause of Somerville's death on August 7, 2006. The Court must look again to each expert's testimony and assess credibility in order to determine if Plaintiff met the "more likely than not" standard. Here, Plaintiff has not carried her burden to show that it is more probable than not that, had Dr. Patterson identified the lesion on the August 31, 2005, CT scan, Somerville would not have died from TCC.

The question is thus whether the cancer had already developed to such a stage that it was too late to save Somerville's life. After reviewing identical evidence, the parties' experts not surprisingly arrived at opposite conclusions. Plaintiff's experts asserted that if the lesion had been detected on August 31, 2005, it is more likely than not that Somerville would have survived the TCC. They stated that this was an aggressive cancer but that it was not yet metastatic at the time of the CT scan. Dr. Gobien stated that although at least one lymph node was enlarged at the time of the CT scan, the node was not abnormal. He testified that it measured only 13-14 mm. According to Dr. Gobien, the consensus is that a lymph node is only abnormal when 15 mm and greater. Plaintiff's expert Dr. Singer explained that the size of the primary tumor and the involvement of the lymph nodes are the most important factors regarding outcome. However, Dr. Singer testified that it was impossible to tell if the node was cancerous. He opined that no evidence showed that Somerville could have had distant metastatic disease

in August 2005. According to Dr. Singer, Somerville thus had stage 3 cancer with a survival rate of over 60%.

Defense expert Dr. Clark testified that at the time of the August CT scan, the lymph node was almost 2 cm and more likely than not contained cancer. He echoed Dr. Gobien's testimony by stating that one of the strongest predictive factors of outcome for TCC is the involvement of lymph nodes. However, Dr. Clark testified that the literature establishes that size is irrelevant when lymph nodes are positive. Dr. Clark opined that the lymph node was likely positive at the time of the August CT scan. Thus, according to Dr. Clark, Somerville had roughly a 70% chance of death from the disease even if he had undergone surgery at that point. Defendant's expert Dr. Paulson also testified that the lymph node on the CT scan was problematic because of the degree to which it was enlarged. This factor and its density, according to Dr. Paulson, revealed that the node had tumor in it. Dr. Paulson explained that because the node had tumor, the TCC had become metastatic.

Although Dr. Gobien and Dr. Singer each appeared knowledgeable and relatively well-informed about the details of the case, the Court finds Dr. Clark's and Dr. Paulson's testimonies more persuasive. The Court again notes significant distinctions in the qualifications of Plaintiff's and Defendant's experts. Dr. Clark not only is a surgeon urologist, he is also an assistant professor at Vanderbilt familiar with the literature, whereas Drs. Gobien and Singer rarely if ever mentioned the literature. Dr. Paulson is a full professor at Duke and chief of abdominal imaging. The Court finds that Dr. Paulson's practice of reviewing the scans – as if in the shoes of the radiologist – before receiving information about the case lends even more credibility to his testimony.

In sum, having accepted Dr. Clark's and Dr. Paulson's opinion that the tumor had already become metastatic by the time of the August CT scan as the more persuasive theory, the Court believes that even if Dr. Patterson had detected the lesion on the kidney in the scan on August 31, 2005, it is not likely that his TCC would have been curable. The Court is not satisfied that Plaintiff has proven more likely than not that a lymph node was not involved at the time of the CT scan and that the tumor was not metastatic. Neither has Plaintiff convinced the Court that it was more likely than not that Somerville would have survived the disease despite the lymph node. Plaintiff only offers testimony that the lymph node was possibly 1-2 mm smaller than what would have been abnormal. However, this is contradicted by Dr. Clark's testimony that size does not matter if a lymph node is cancerous. The likelihood that Somerville would have died regardless of Dr. Patterson's breach is also supported by Dr. Paulson's testimony that this lymph node was dense and was cancerous. Therefore, the Court concludes that Dr. Patterson's breach of the standard of care was likely not the proximate cause of Somerville's death.

In finding for the Defendant in this matter, the Court does not intend to minimize the fact that Somerville's family has suffered a great loss. Indeed, it became clear to the Court over the course of the trial that Somerville left behind a devoted wife who selflessly cared for her husband through decades of mental and physical problems. However, the Court is duty-bound to follow the law without regard to sympathy; in this case the law simply does not support a finding for Plaintiff.

## IV. PLAINTIFF'S MOTION TO ADD SURVIVAL CLAIM

At the close of Defendant's case, Plaintiff made an ore tenus motion to amend her complaint to conform to the evidence presented at trial – specifically, to add a survival claim against Dr. Patterson pursuant to Fla. Stat. § 46.021. The Court directed Plaintiff to brief this issue. Plaintiff asserts that she should be permitted to add this claim because evidence was introduced at trial, to which the government did not object, that Somerville's "increased tumor-burden" between the August 2005 CT scan and February 2006 surgery "essentially shortened his life expectancy and quality of life." (Doc. No. 53 p. 3.) Plaintiff contends that Federal Rule of Civil Procedure 15(b)(2) "is liberally applied to allow amendment for issues tried by consent." (*Id.* at 2.) She also asserts that the information she entered on Standard Form 95 (*see* Doc. No. 53-1) fulfilled the FTCA's notice requirements. Finally, according to Plaintiff, Florida law allows her to plead a survival action as an alternative to the wrongful death action. Defendant filed a response in opposition on June 10, 2010, arguing that Form 95 was not sufficient to fulfill the notice requirements for a personal injury action and that the government did not implicitly consent to amendment under Rule 15(b)(2). (Doc. No. 63). The Court will deny Plaintiff's motion because Plaintiff did not present evidence at trial that indicated she was adding a survival claim; therefore, Defendant did not implicitly consent to its addition. Further, Form 95 did not contain the requisite details of this alternative claim.

Plaintiff has not established that the government implicitly consented to adding a survival claim simply by failing to object to trial testimony regarding Somerville's "tumor-burden." Contrary to Plaintiff's assertion, the Court finds that the testimony was relevant to the wrongful death action. This is also not a case where the parties' submissions reflect an agreement to include this claim. The Court notes that neither party mentions such claim in the

pretrial stipulation. Details were not raised at trial to support such a claim and litigating it would require the consideration of different facts and measures of recovery.

In any event, a plaintiff who sues under the FTCA "must first present his or her claim to the appropriate federal agency" and fulfill the requirements of 28 U.S.C. § 2675(a). *Burchfield v. United States*, 168 F.3d 1252, 1254 (11th Cir. 1999). In order to do so, a claimant must (1) give the appropriate agency written notice of the claim and (2) place a value on that claim. *Id.* at 1255. A plaintiff sufficiently notifies the VA of his or her claims on Form 95 when no other facts the plaintiff could have included in his or her administrative claim would have allowed the VA to conduct a more thorough investigation of the claim. *Id.* at 1256. In *Burchfield*, the Eleventh Circuit explained that the details raised at trial "were so closely related to the essential material contained in the claim that they would have come to light during the VA's reasonable investigation of the claim." *Id.* The court continued, "All that is required is that the theory put forward in the complaint filed in the district court be based on the facts that are stated in the administrative claim." *Id.*

This is not the case here. Plaintiff did not include details indicating a survival action on Form 95. In her statement regarding the nature and extent of the injury or death that forms a basis for the claim, Plaintiff only entered: "Failure to timely diagnose and treat transitional cell renal carcinoma, allowing it to advance and spread over a significant period of time until it became untreatable, thus causing the death of Mr. Somerville." (Doc. No. 53-1.) The wrongful death and survival statutes create distinct causes of actions, which are mutually exclusive. *See Poole v. Tallahassee Mem'l Hosp., Med. Ctr., Inc.*, 520 So. 2d 627, 629 n.1 (Fla. 1st DCA 1988). Plaintiff's Form 95 indicated only the former – the injury was the death; thus, Plaintiff

did not provide notice sufficient to maintain the prerequisites for suit against the government regarding the "alternative" theory of recovery.

Finally, a survival action is obviously a claim Plaintiff could have foreseen. Unlike in *Burchfield*, where the plaintiff alleged the claim at issue in the complaint, here Plaintiff waited until the end of trial. The Court can conceive of only two reasons Plaintiff would do so: either Plaintiff did not consider such claim earlier or Plaintiff waited to surprise Defendant. Neither justifies the prejudice to Defendant. A court will not find implied consent if the nonmoving party would be prejudiced by the injection of the new issue. *Cioffe v. Morris*, 676 F.2d 539, 541-42 (11th Cir. 1982). Such prejudice results if "the defendant had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend." *Id.* at 542. Amending the pleadings would deny Defendant an opportunity to present relevant evidence in its defense.

In conclusion, the Court finds that Defendant did not consent to the addition of a survival claim; therefore, amendment pursuant to Rule 15(b) is not required. Moreover, the Court finds that Defendant would be prejudiced with its addition. Plaintiff also failed to satisfy the requirements of 28 U.S.C. § 2675(a). Thus, Plaintiff's motion will be denied.

## V. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The Clerk is directed to enter a final judgment providing that the Plaintiff, Teryll Somerville, shall take nothing on her claims against the Defendant, United States of America.

2. It is further ORDERED that Plaintiff's Motion to Amend Complaint to Add a Survival Claim (Doc. No. 53), filed on June 7, 2010, is DENIED.

3. The Clerk shall close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida, on June 30, 2010.

Copies furnished to:

Counsel of Record

ANNE C. CONWAY
United States District Judge